FILED

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

01 JAN -9 AM 9: 43

U.S. DISTRICT COURT
N.D. OF ALABAMA

TINA SHOEMAKER            )

    PLAINTIFF,            )

VS.            )            CV-99-H-2882-E

NORTHEAST ALABAMA REGIONAL            )
MEDICAL CENTER,
                      )
    DEFENDANT.

**ENTERED**

JAN 0 9 2001

## MEMORANDUM OF DECISION

The Court has before it the November 1, 2000 motion of

defendant Northeast Alabama Regional Medical Center ("NEARMC")

for summary judgment.  Pursuant to the Court's November 3, 2000

order, the motion was deemed submitted, without oral argument, on

December 1, 2000.

### I. Procedural History

Plaintiff Tina Shoemaker commenced this action on October

27, 1999 by filing a complaint in this court claiming liability

on the part of her employer for allegedly retaliating against

plaintiff because she complained of sexual harassment by her

Charge Nurse.  (See Compl. ¶¶ 8-11.)  In her complaint, plaintiff

contended that defendant's alleged conduct constituted a

violation of Title VII, 42 U.S.C. ¶¶ 2000e, et. seq.  (See Compl.

¶ 1.)  On November 10, 1999, plaintiff filed an amended complaint



adding only a line to paragraph ten that was omitted from the first complaint. (See Am. Compl.)  Defendant filed an answer on November 19, 1999 and an Amended Answer on December 2, 1999. (See Def.'s Answer; Def.'s Am. Answer.)  Defendant's November 1, 2000 motion for summary judgment asserts that plaintiff cannot establish a prima facie case of retaliation with respect to the majority of alleged retaliatory acts, and that plaintiff cannot produce evidence sufficient to permit a reasonable factfinder to disbelieve defendant's proffered nondiscriminatory reasons for the actions allegedly taken against plaintiff.  (See Def.'s Mot. Summ. J.)

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment.  On November 1, 2000, defendant submitted evidence[1] in support of the motion and filed a supporting memorandum of law.  Plaintiff submitted evidence[2] in

---

[1] Defendant submitted excerpts from Volume I of the June 13, 2000 deposition of Tina Shoemaker with exhibits and excerpts from Volume II of the August 16, 2000 deposition of Tina Shoemaker with exhibits; excerpts from the August 16, 2000 deposition of Cindy New; excerpts from the August 17, 2000 deposition of Ann Hopkins; excerpts from the August 17, 2000 deposition of Nadine Kelly; excerpts from the August 17, 2000 deposition of Susan Quinn; the October 24, 2000 affidavit of Cindy New with exhibit; and the October 24, 2000 affidavit of Joy Webb.

[2] Plaintiff submitted Volume II of the August 16, 2000 deposition of Tina Shoemaker; the August 16, 2000 deposition of Cindy New; the August 17, 2000 deposition of Ann Hopkins; the

2

opposition to the motion on November 30, 2000.  The court notes
that the deposition of plaintiff was taken on two separate dates,
June 13, 2000 (Volume I) and August 15, 2000 (Volume II);
plaintiff only submitted the August 15, 2000 deposition (Volume
II) of Tina Shoemaker as part of plaintiff's evidentiary
submission.[3]  Plaintiff filed an opposing brief on December 8,
2000.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary
judgment is proper "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to judgment
as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986).  The party asking for summary judgment always bears the

---

August 17, 2000 deposition of Susan Quinn; and the August 17,
2000 deposition of Nadine Kelly.

[3] The plaintiff has had ample time to submit evidentiary
materials in support of its memorandum in opposition to summary
judgment.  On November 29, 2000, the court granted plaintiff's
Motion to File Evidentiary Materials out of Time and extended the
deadline for plaintiff's evidentiary submission from November 24,
2000 to December 1, 2000.   Therefore, the court will not
consider cites from the plaintiff's brief to the June 13, 2000
deposition of Tina Shoemaker to the extent that those cites are
not included in the excerpts of the June 13, 2000 deposition of
Tina Shoemaker submitted by defendant as part of its evidentiary
materials.

initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real

4

Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden

5

at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

In November of 1991, plaintiff began working for NEARMC in Anniston, Alabama as a nurse in the Oncology Department. (See Dep. of Tina Shoemaker 29, 35; Aff. of Cindy New ¶ 1.)  In late 1994, plaintiff left NEARMC to work at Seaton Home Health Care

---

[4] If facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

but returned to NEARMC as a part-time employee in March of 1995
and then as a full-time employee in the oncology unit in October
of 1995.[5]  (See Dep. of Tina Shoemaker at 29-30, 35.)  Plaintiff
worked in the oncology unit at NEARMC until her resignation on
October 29, 1999.  (See id. at 306-307.)  When plaintiff returned
to work full-time at NEARMC in 1995, she worked third shift and
reported to Charge Nurses Jim Alexander and Nadine Kelly.  (See
id. at 44.)  Plaintiff reported 80% of the time to Jim Alexander
and 20% of the time to Nadine Kelly.  (See Dep. of Cindy New 36.)
Plaintiff worked from 11:00 to 7:00 during the weekdays and
twelve hours on the weekends; she worked seven consecutive days
and then was off for a day or two.  (See Dep. of Tina Shoemaker
45.)  Cindy New has served as the nurse manager for NEARMC since
the early 1990's and was plaintiff's supervisor in 1992 and again
in 1995 when plaintiff returned to work at NEARMC.  (See Dep. of
Cindy New at 34-35, Dep. of Tina Shoemaker 35.)

In August of 1998, plaintiff asked Cindy New if she could
change her schedule because she was "having a problem."  (Dep. of
Tina Shoemaker 123-126.)  Ms. New inquired about the specifics of

---

[5] Plaintiff testified that when she returned to work in
1995, NEARMC readjusted her hire date for benefits purposes, but
did not readjust it for seniority purposes and this allegedly
caused her to not receive a first shift job in 1995 and 1996.
(See Dep. of Tina Shoemaker 176-177; 365-368.)  This is not a
claim in this case, however.

the problem and plaintiff "told her that Jim [Alexander] had a thing for [her], that he was bothering [her] . . . . [and] grabbed hold of [her] going down the hall one day." (Id. at 125-127.)   Plaintiff asked Ms. New to keep her complaints confidential because she wanted to avoid embarrassment.  (See id. at 130.)

NEARMC has a policy against sexual harassment that is outlined in the employee handbook, (see id. at 137, 336-337; Def.'s Ex. 10 to Dep. of Tina Shoemaker 336); Ms. New followed the policy and reported Alexander's alleged conduct to Joy Webb, Assistant Vice-President of Nursing, (See Aff. of Cindy New ¶ 3). Ms. New interviewed Alexander about the charges and when he denied them, she warned him to "keep his hands to himself . . . [and] stay away from Tina and have no physical contact."  (Dep. of Cindy New 48-49.)  After conducting an investigation, NEARMC determined that "there was not sufficient credible evidence to support plaintiff's claims [of sexual harassment]."  (Aff. of Joy Webb ¶ 2.)  A couple of weeks after plaintiff's complaints, Alexander announced he would retire in October of 1998.  (See Aff. of Cindy New ¶ 3.)  Plaintiff testified that Alexander did not retaliate against her for the complaint and "was gone within no time."  (Dep. of Tina Shoemaker 140-141.)

After plaintiff met with Cindy New in October of 1998 and

Alexander retired, Ms. New issued a letter to the night shift nurses that outlined the delegation of Charge Nurse duties in the absence of the regularly scheduled Charge Nurse and listed plaintiff second-in-command.  (See id. at 147-148; Def.'s Ex. 13 to Dep. of Tina Shoemaker thereto.)  Not all of the nurses received the letter. (see Dep. of Tina Shoemaker 149.)  Plaintiff was displeased because she claimed that she was more experienced than the nurse listed first-in-command and because the nurse listed first on the letter was allowed to "choose" whether she wanted to serve as Charge Nurse.  (See Dep. of Tina Shoemaker 147-151, 180-181; Def.'s Ex. 13 to Dep. of Tina Shoemaker thereto.)  After plaintiff complained to Cindy New and before plaintiff was required to perform any duties according to the delegation listed on the memo, (see Dep. of Tina Shoemaker 163-164), New retrieved the memo and issued a revised memorandum on October 30, 1998 that listed plaintiff first and reflected her experience in the department of Oncology, (see id. at 151, 180-181; Def.'s Ex. 14 to Dep. of Tina Shoemaker thereto).

After Alexander retired in October of 1998, the Charge Nurse job became open, and Ms. New considered plaintiff and Ann Hopkins for the position.  (See Dep. of Cindy New 52-53.)  Plaintiff expressed interest in the position to Ms. New, (see id. at 53), and had served as the relief Charge Nurse when the primary Charge

Nurse was not available and on the weekends.  (<u>See</u> Dep. of Cindy New 60-61; Dep. of Tina Shoemaker 143-144.)  The Charge Nurse position pays 60 cents more an hour over that of a regular nurse, but the "honor" of the position and the ability to make assignments makes the position desirable.  (<u>See</u> Dep. of Cindy New 53-54.)  The Charge Nurse position is a supervisory role that requires that the Charge Nurse be "well-received among the other nurses." (Aff. of Cindy New ¶ 5.)  Plaintiff agreed that the Charge Nurse has to have a good working relationship with the other nurses on the shift.  (<u>See</u> Dep. of Tina Shoemaker 186-187.)

Cindy New selected Ann Hopkins to fill the position of Charge Nurse.  (<u>See</u> Aff. of Cindy New ¶ 6.)  Ms. New stated that she considered attendance, dependability, teamwork, patient complaints, patient issues, staff issues, attitude, and overall performance when selecting a candidate for the position of Charge Nurse.  (<u>See</u> Dep. of Cindy New 52-53.)  Ms. New testified that plaintiff had stronger nursing skills than Ann Hopkins and more experience in Oncology, (<u>see</u> <u>id.</u> at 57), but that Ann Hopkins was best qualified for the job because of Hopkins' strength in the three areas that New considered to be the most important: teamwork, dependability, and attitude.  (<u>See</u> Aff. of Cindy New ¶ 6; Dep. of Cindy New 52-53.)  Plaintiff stated that Cindy New told her that seniority was also a reason why plaintiff was not

10

selected for the Charge Nurse position.[6]  (Dep. of Tina Shoemaker
143-145.)

Ms. New stated that plaintiff was not the best qualified
candidate because of patient complaints concerning the care
received from plaintiff, because plaintiff had called in seven
times in a twelve-month period to say she was not coming to work,
because plaintiff's co-workers strongly indicated to Ms. New that
they did not want plaintiff to serve as Charge Nurse because of
concerns about her supervisory and leadership skills, and because
of New's own concerns about plaintiff's leadership and management
skills.  (See Aff. of Cindy New ¶ 7.)  Plaintiff stated in her
deposition that patients had complained about her in the past,
(see Dep. of Tina Shoemaker 69), and that six call-in absences
from work were acceptable and she had seven absences, (see Dep.
of Tina Shoemaker 336).  Plaintiff's co-workers made the
following remarks about plaintiff's disposition[7]:  she needed to
improve her relationship with her co-workers, (see Dep. of Ann

---

[6] Defendant maintains that seniority was not a factor that
Cindy New considered when determining which candidate to select
for the position of Charge Nurse and that regardless, Ann Hopkins
had an earlier seniority date within the Oncology Department than
plaintiff.  (See Dep. of Cindy New 56-57; Aff. of Cindy New ¶ 6.)

[7] The statements were allegedly made by her co-workers
before they new of plaintiff's complaints of alleged sexual
harassment or her EEOC charge. See Dep. of Ann Hopkins 14-15, 25-
26; Dep. of Nadine Kelly 8, 21-23; Dep. of Susan Quinn 11-12,
17.)

Hopkins 26), she "appeared [] to be an unhappy person . . . [and] was always complaining about something, (Dep. of Nadine Kelly 22), and "it was miserable . . . to have to work with her because she is a very unhappy person," (Dep. of Susan Quinn 12). One of plaintiff's co-workers threatened to leave the unit if plaintiff was selected for the Charge Nurse position. (See id.)

In 1999, Cindy New completed a performance evaluation of plaintiff that included "negative" comments that "put [plaintiff] under a lot of stress" and caused her to believe that "it was the beginning of the end of [her] job." (Dep. of Tina Shoemaker 82-83.) The evaluation included the remark that plaintiff's negativity "is detrimental to the overall effectiveness of the entire team," (id. at 331-332), but the summary of evaluation stated that "Tina is a very good nurse, very knowledgeable and clinically strong . . . and has much to offer her co-workers if willing to share constructively." (Def.'s Ex. 9 to Dep. of Tina Shoemaker 331-332.) Plaintiff received an overall "successful" rating on the evaluation, (Def.'s Ex. 9 to Dep. of Tina Shoemaker 331-332), and a three percent raise, (see Dep. of Tina Shoemaker 78). Ann Hopkins, Charge Nurse at the time of plaintiff's 1999 evaluation, provided input and commented that plaintiff had good nursing skills but needed to work on improving her relationships with co-workers. (See Dep. of Ann Hopkins 25-26.)

In the spring of 1999, defendant assigned a part-time
employee to assist the Chemotherapy Research Nurse, (see Dep. of
Tina Shoemaker 86-88), and plaintiff felt that defendant should
have offered her the position and should have known that she was
interested in the position because plaintiff "applied for the
chemo nurse job -- the research nurse job back whenever it was
opened a couple of years ago." (Dep. of Tina Shoemaker 87.)
Defendant testified that there was no actual assistant position
available, but that a part-time employee was assigned to assist
on an as-needed basis. (See Aff. of Cindy New ¶ 9.)  Cindy New
stated that she asked plaintiff if she was interested in
assisting the Chemotherapy nurse before assigning the position,
and plaintiff declined.  (See id.)  After the assistant position
was assigned,  plaintiff made a negative comment to her co-
workers about the part-time Chemotherapy assistant job and stated
that a "big negative note" was placed on the board at the nurses'
station that was targeted at her. (Dep. of Tina Shoemaker 85.
88-89.)  Plaintiff does not recall the contents of the memo and
stated that the memo did not specifically refer to her.  (See
id.)

In the summer of 1999, plaintiff requested that Cindy New
switch her schedule to a nine-consecutive day term.  (See Dep. of
Tina Shoemaker 214-216; 380-382.)  Plaintiff typically was

13

scheduled to work eight consecutive days in a two-week period,
(see id. at 220, 229), and plaintiff asked Cindy New to add an
additional day to her schedule so that plaintiff could work nine
days in a two-week period, (see id. at 93, 214-216).  New told
plaintiff that she could work either nine non-consecutive days or
eight consecutive days. (See id. at 214-216.)  No employee under
New had been allowed to work nine consecutive days. (See id. at
93-94, 215, 379.)  Plaintiff informed New that she did not want
to work a nine-day schedule if they were not consecutive days,
(see id. at 216, 380-381), and New changed plaintiff's schedule
back to eight consecutive days and asked plaintiff to sign a form
stating that plaintiff forfeited her right to work nine days in a
pay period by choosing to work the eight consecutive-days block,
(see id. at 216, 226, 377; Def.'s Ex. 20 to Dep. of Tina
Shoemaker 377).  Plaintiff stated that New required her to sign
the form because she had filed an EEOC charge, although plaintiff
stated that she has no evidence to support her belief.  (See Dep.
of Tina Shoemaker 381-382.)  Plaintiff also stated that Cindy New
changed her schedule while plaintiff was on vacation resulting in
plaintiff being scheduled to work during her vacation.[8] (See id.

---

[8] Defendant maintains that it was an inadvertent computer
scheduling error that caused plaintiff to be scheduled to work
while on vacation and Cindy New took responsibility for the
mistake and apologized to plaintiff. (See Aff. of Cindy New ¶ 10;

14

at 93, 218.)  Plaintiff stated that she had to return one day early from her vacation because someone from work called to see if plaintiff would be able to work her scheduled shift.  (See Dep. of Tina Shoemaker 222-224.)  Plaintiff did not actually report to work during her scheduled vacation, however.  (See id. at 223-224.)

Plaintiff also stated that some of her patient assignments were "given to [her] just to create a hostile situation."  (Dep. of Tina Shoemaker 346.)  Plaintiff specifically recalls two patients, one of whom was a "difficult" post-surgery patient who did not want to be woken up, but who plaintiff felt needed to be woken up to check on her condition.  (Id. at 346-348.)  When plaintiff went into the patient's room to awaken her, the patient was already awake.  (See id. at 347-348.)  Plaintiff also stated that she was assigned to care for a gentleman who "was just ugly to everybody," but stated that other nurses were also assigned to care for him.  (Id. at 349.)

Plaintiff also stated that her co-workers made comments to her that made her uncomfortable and made her feel like she was going to be fired.  (See id. at 96-97, 206, 310-311.)  Other nurses told plaintiff that Alexander would be returning to work

---

Dep. of Tina Shoemaker 222.)

"after everything was settled." (Id. at 96-98, 101-102.)
Plaintiff also stated that her complaints about Alexander were
not kept confidential because another nurse commented, during a
discussion about President Clinton's sexual scandal, that sexual
harassment "goes on everywhere, and it's a lot closer to you than
you realize." (Id. at 138.)  Plaintiff also testified that her
coworkers made her uncomfortable and that she knew that other
nurses talked about her, although she never heard her name
mentioned. (See id. at 310-311.)  After plaintiff had submitted
her resignation and voluntarily terminated her employment with
defendant, one of her co-workers "verbally assaulted" her and
asked if plaintiff wanted to step outside. (Id. at 206-208.)

     Plaintiff voluntarily resigned from NEARMC and her last day
of work was November 11, 1999. (See Dep. of Tina Shoemaker 306-
308; Def.'s Ex. 7 to Dep. of Tina Shoemaker thereto.)  Plaintiff
filed a Charge of Discrimination with the EEOC in April of 1999,
(see Def.'s Ex. 1 to Dep. of Tina Shoemaker), and the EEOC issued
a Notice of Right to Sue on July 30, 1999, (see Def.'s Ex. 2 to
Dep. of Tina Shoemaker).  On October 27, 1999, plaintiff timely
filed this suit. (See Compl.)

### IV. Applicable Substantive Law and Analysis

     As noted earlier, plaintiff's complaint alleges that
defendant is liable under Title VII for allegedly retaliating

16

against plaintiff because she complained of sexual harassment by
her Charge Nurse.  (See Compl. ¶¶ 8-11.)  Specifically, plaintiff
claims that defendant committed the following allegedly
retaliatory acts:  (1) issuing a memo outlining the delegation of
Charge Nurse duties in October of 1998 and listing plaintiff
second in command, (2) giving plaintiff a poor performance
evaluation, (3) not offering plaintiff the opportunity to assist
the Chemotherapy Research Nurse in the spring of 1999 and placing
a "negative" memorandum regarding the position at the Nurse's
station, (4) refusing to change plaintiff's schedule to a
consecutive nine-day term in the summer of 1999 and changing
plaintiff's schedule while she was on vacation, (5) assigning
plaintiff to work with undesirable patients, (6) commenting by
co-workers about the alleged sexual harassment incident, and (7)
denying plaintiff the Charge Nurse job in October of 1998.
Defendant's motion for summary judgment asserts that plaintiff
cannot establish a prima facie case of retaliation with respect
to the majority of alleged retaliatory acts, and that plaintiff
cannot produce evidence sufficient to permit a reasonable
factfinder to disbelieve defendant's proffered nondiscriminatory
reasons for the actions allegedly taken against plaintiff.  (See
Def.'s Mot. Summ. J.)  The Court is aware that the summary
judgment rule applies in job discrimination cases just as in

17

other cases.   See Chapman v. AI Transport, 229 F.3d 1012, 1025

(11th Cir. 2000) (en banc) (rejecting an earlier, contrary

general rule and emphasizing that no thumb is to be placed on

either side of the scale).

Title VII governs employment relationships and provides

that:

> It shall be an unlawful employment practice
> for an employer-
> (1) to fail or refuse to hire or to discharge
> any individual, or otherwise to discriminate
> against any individual with respect to his
> compensation, terms, conditions, or
> privileges of employment, because of such
> individual's race, color, religion, sex, or
> national origin . . . .

42 U.S.C. § 2000e-2(a) (1994).   Furthermore, it is unlawful

practice for an employer to discriminate against an employee

"because [s]he has opposed any practice made an unlawful

employment practice by this subchapter, or because [s]he has make

a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing under this subchapter."

42 U.S.C. § 2000e-3(a) (1994).   Plaintiff alleges that, in

violation of Title VII, defendant retaliated against her because

she complained about her Charge Nurse's alleged sexual

harassment.

The analysis of the plaintiff's claims will be determined

not only by the nature of the allegations but also by the quality

of the evidence offered in support of those claims.   See Standard

v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)
(noting that "[t]he analytical framework and burden of production
var[y] depending on the method of proof chosen").  In general, a
plaintiff may attempt to establish a claim of illegal employment
discrimination through the use of direct evidence, circumstantial
(indirect) evidence, or statistics.  See id.; see also Schoenfeld
v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the
availability of either direct or circumstantial evidence).  A
plaintiff's ability to proceed through the use of circumstantial
evidence of discrimination is necessarily important because
direct proof of discrimination is uncommon.  See Combs v.
Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997);
Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir.
1987).  Direct evidence is "[s]uch evidence [which], if believed,
proves the existence of a fact in issue without inference or
presumption."  Burns v. Gadsden State Community College, 908 F.2d
1512 (11th Cir. 1990).  Cf. Wright v. Southland Corp., 187 F.3d
1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct
evidence as "evidence from which a reasonable trier of fact could
find, more probably than not, a causal link between an adverse
employment action and a protected personal characteristic" and
finding the outcomes reflected in prior case law consistent with
that definition).  However, direct evidence does not include

"stray remarks in the workplace" or "statements by nondecisionmakers" or "statements by decisionmakers unrelated to the decisional process itself." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (O'Connor, J., concurring) (1989); see also EEOC v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir. 1990) (quoting Price Waterhouse).

Here, plaintiff has presented only circumstantial evidence of retaliation. "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527. Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. See id. at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation. See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928,

20

937 (11th Cir. 1983).  In general, a plaintiff establishes a
prima facie case of employment discrimination by showing that he
or she was a qualified member of a protected class and was
subjected to an adverse employment action but that otherwise
similarly situated employees outside the plaintiff's class were
treated dissimilarly.  See McDonnell Douglas, 411 U.S. at 802.

Once the plaintiff has shown a prima facie case and,
thereby, has raised the presumption of discrimination, the burden
of production shifts to the employer to proffer a legitimate and
nondiscriminatory reason for its actions.[9]  See Combs, 106 F.3d
at 1528.  The employer "need not persuade the court that it was
actually motivated by the proffered reason[]."  Burdine, 450 U.S.
at 254-55; see Chapman, 229 F.3d at 1024.  If the employer
satisfies that burden by articulating one or more such reasons,
then the presumption of discrimination falls and the burden of
production again shifts to the plaintiff to offer evidence
sufficient for a reasonable jury to conclude that the employer's
supposedly legitimate reason is merely a pretext for illegal
discrimination.[10]  Where the defendant articulates multiple,

---

[9] See Chapman, 229 F.3d at 1032 (A subjective reason is a
legally sufficient, legitimate, nondiscriminatory reason if the
defendant articulates a clear and reasonably specific factual
basis upon which the employer based its subjective opinion.).

[10] If the proffered reason is one that might motivate a
reasonable employer, a plaintiff cannot recast the reason but

reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 29 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at. 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097,

---

must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion);[11] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

Generally, to establish a prima facie case of retaliation a plaintiff must show:  (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) there was a causal link between her protected activity and the adverse employment action.  See Gupta v. Florida Board of Regents, 212 F.3d 571, 587 (11th Cir. 2000); Griffin v. GTE Fla., Inc., 182 F.3d 1279, 1281 (11th Cir. 1999).  The

---

[11] The court in Chapman modified the statement in Combs contrary to this holding in Reeves after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

Eleventh Circuit recently defined what constitutes an "adverse employment action:"

> An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1300 (3rd Cir. 1997).  Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality . . . to become cognizable under the anti-retaliation clause." <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1456 (11th Cir. 1998). In evaluating what actions meet that required level of substantiality, we recognize that "Title VII is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" <u>Anderson v. Coors Brewing Co.</u>, 181 F.3d 1171, 1178 (10th Cir. 1999) (citation omitted). Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, <u>id.</u> at 1178, using both a subjective and objective standard, <u>see</u> <u>Doe v. Dekalb County School Dist.</u>, 145 F.3d 1441, 1448-49 (11th Cir. 1998) (recognizing that the subjective requirement is virtually almost always satisfied when imposing an objective requirement as well).

<u>Gupta</u>, 212 F.3d at 587.  Furthermore, "[a] proposed action that is corrected as soon as the proper official is made aware of it and before it goes into effect, so that the employee does not actually suffer any consequences, is not 'adverse.'" <u>Id.</u> at 588.

24

With respect to the causal connection requirement, plaintiff must establish that the protected activity and the adverse employment action were not "wholly unrelated," <u>EEOC v. Reichhold Chem., Inc.</u>, 988 F.2d 1564, 1571 (11th Cir. 1993), and absent any direct evidence of a causal link, plaintiff must establish that the employer was aware of her protected activity and that the activity and adverse employment action were in temporal proximity, <u>see</u> <u>Griffin</u>, 182 F.3d at 1284.

Plaintiff's complaint alleges a number of specific decisions made by defendant that plaintiff seeks to elevate to the level of adverse employment actions.  The court finds that plaintiff cannot establish a prima facie case of retaliation with respect to six out of seven of the alleged retaliatory acts because all but one, "denying plaintiff the Charge Nurse job in October of 1998," fall short of adverse employment actions, both singularly and collectively.[12]  First, plaintiff complains of an October 1998 memo that outlined the delegation of Charge Nurse duties and

_____

[12] This decision eliminates the need to address the third element of the prima facie case, causation, which would nonetheless destroy most or all of the six alleged retaliatory acts discussed above because plaintiff cannot establish temporal proximity and/or a causal connection between the sexual harassment complaint lodged with Cindy New/EEOC filing and the alleged acts.  Furthermore, the court need not discuss the legitimacy of defendant's articulated reasons with respect to those six acts because plaintiff has failed to prove the prima facie case of retaliation.

listed plaintiff second-in-command; plaintiff was displeased because she claimed that she was more experienced than the nurse listed first-in-command and because the nurse listed first on the letter was allowed to "choose" whether she wanted to serve as Charge Nurse.  (See Dep. of Tina Shoemaker 147-151, 180-181; Def.'s Ex. 13 to Dep. of Tina Shoemaker thereto.)  Plaintiff complained to Nurse Manager Cindy New and before plaintiff was required to perform any duties according to the delegation listed on the memo, (see Dep. of Tina Shoemaker 163-164), New retrieved the memo and issued a revised memorandum on October 30, 1998 that listed plaintiff first and reflected her experience in the department of Oncology, (see id. at 151, 180-181; Def.'s Ex. 14 to Dep. of Tina Shoemaker thereto).  The October 1998 memorandum was not an "adverse employment action" because it was "corrected as soon as the proper official [wa]s made aware of it and before it [went] into effect, so that [plaintiff did] not actually suffer any consequences."  Gupta, 212 F.3d at 588.

Second, plaintiff alleges that the "negative" comments on her 1999 performance evaluation "put [plaintiff] under a lot of stress" and caused her to believe that "it was the beginning of the end of [her] job."  (Dep. of Tina Shoemaker 82-83.) Plaintiff "had a problem" with certain comments on her evaluation including the remark that her negativity "is detrimental to the

overall effectiveness of the entire team." (Id. at 331-332.)
Criticisms about plaintiff's negativity on her performance
evaluation simply do not constitute an adverse employment action
because there is no evidence that the evaluation adversely
affected her status as an employee or deprived her of any
employment opportunities. See Robinson, 120 F.3d at 1300.
Plaintiff received an overall "successful" rating on the
evaluation, (Def.'s Ex. 9 to Dep. of Tina Shoemaker 331-332), and
a three percent raise, (see Dep. of Tina Shoemaker 78). In fact,
despite the negative comments, the summary of evaluation stated
that "Tina is a very good nurse, very knowledgeable and
clinically strong . . . and has much to offer her co-workers if
willing to share constructively." (Def.'s Ex. 9 to Dep. of Tina
Shoemaker 331-332.)

Third, plaintiff alleges that defendant did not offer
plaintiff the opportunity to assist the Chemotherapy Research
Nurse in the spring of 1999 and later placed a "negative"
memorandum, that plaintiff claims was targeted at her, regarding
the position at the Nurse's station. (Dep. of Tina Shoemaker 86-
89.) Plaintiff stated that defendant should have known that she
was interested in the chemotherapy assistant position in 1999
because plaintiff "applied for the chemo nurse job -- the
research nurse job back whenever it was opened a couple of years

ago." (Id. at 87.)  Defendant testified, however, that there was

no actual assistant position available; rather, defendant merely

assigned a part-time employee to assist on an as-needed basis.

(See Aff. of Cindy New ¶ 9.)  Furthermore, defendant asked

plaintiff if she was interested in assisting the Chemotherapy

nurse before assigning the position, and plaintiff declined.

(See id.)  Plaintiff also complains about a "negative memo"

posted at the Nurse's station after plaintiff made a negative

comment to her co-workers about the part-time Chemotherapy

assistant job; plaintiff does not recall the contents of the memo

and admitted that the memo did not specifically refer to her.

(Dep. of Tina Shoemaker 85, 88-89.)  The above incidents are not

ultimate employment decisions and fall short of the required

"threshold level of substantiality . . . to become cognizable

under the anti-retaliation clause." Wideman, 141 F.3d at 1456.

Fourth, plaintiff also expressed displeasure that defendant

did not change plaintiff's schedule to a consecutive nine-day

term in the summer of 1999.[13]  (See Dep. of Tina Shoemaker 214-

---

[13] Plaintiff also complained that Cindy New changed her
schedule while plaintiff was on vacation resulting in plaintiff
being scheduled to work during her vacation. (See id. at 93,
218.)  Defendant maintains that it was an inadvertent computer
scheduling error that caused plaintiff to be scheduled to work
while on vacation and Cindy New took responsibility for the
mistake and apologized to plaintiff. (See Aff. of Cindy New ¶ 10;
Dep. of Tina Shoemaker 222.)  Inadvertent computer error does not

216; 380-382.)  Plaintiff asked Cindy New to add an additional day to her schedule so that plaintiff could work nine days in a two-week period, (see id. at 93, 214-216), and New accommodated plaintiff, allowing her to work nine non-consecutive days, (see id. at 214-216), because no employee under New has been allowed to work nine consecutive days, (see id. at 93-94, 215, 379).  Plaintiff informed New that she did not want to work a nine-day schedule if they were not consecutive days, (see id. at 216, 380-381), and New changed plaintiff's schedule back to eight consecutive days and asked plaintiff to sign a form stating that plaintiff forfeited her right to work nine days in a pay period by choosing to work the eight consecutive-days block.  (See id. at 216, 226, 377; Def.'s Ex. 20 to Dep. of Tina Shoemaker thereto.)  Plaintiff "felt" that New required her to sign the form because she had filed an EEOC charge, although plaintiff admits she has no evidence to support her belief.  (Dep. of Tina Shoemaker 381-382.)  The undisputed facts indicate that defendant was not retaliating against plaintiff, but instead was attempting to accommodate plaintiff's scheduling requests without making special exceptions for plaintiff that were not given to the other

---

constitute an adverse employment action and furthermore, plaintiff admits that she did not actually report to work during her scheduled vacation.  (See Dep. of Tina Shoemaker 223-224.)

employees under Cindy New.  Plaintiff was at no time "deprive[d]
. . . of employment opportunities" because no employee under
Cindy New was allowed to work nine consecutive days.  <u>Robinson</u>,
120 F.3d at 1300.

     Fifth, plaintiff testified that she believes that some of
her patient assignments were retaliatory and "given to [her] just
to create a hostile situation."  (Dep. of Tina Shoemaker 346.)
Plaintiff could only recall two examples of allegedly retaliatory
assignments, one of whom was a "difficult" post-surgery patient
who did not want to be woken up, but who plaintiff felt needed to
be woken up to check on her condition.  (<u>Id.</u> at 346-348.)
Plaintiff also stated that she was assigned to care for a
gentleman who "was just ugly to everybody," but admits that other
nurses were also assigned to care for him.  (<u>Id.</u> at 349.)
Plaintiff has not presented any evidence to suggest that she was
entitled to select her own patients or that other nurses were
allowed to choose the patients to whom they were assigned.  <u>See</u>
<u>Gupta</u>, 212 F.3d at 588 (holding that plaintiff's teaching
assignments were not adverse employment actions where plaintiff
had no evidence to prove that she was entitled to select her
classes or that other professors were allowed to choose the
classes they taught).  There is no evidence to indicate that
these assignments were not part of the ordinary day-to-day

delegation of patients, and they certainly do not rise to the threshold level of substantiality required under Title VII.

Sixth, plaintiff complains that her co-workers made comments to her that made her uncomfortable and made her feel like she was going to be fired.  (<u>See</u> Dep. of Tina Shoemaker 96-97, 206, 310-311.)  Plaintiff specified that other nurses told her that Jim Alexander, the nurse she accused of sexual harassment, would be returning to work "after everything was settled."  (<u>Id.</u> at 96-98, 101-102.)  Plaintiff also believed that her complaints about Alexander were not kept confidential because another nurse commented that sexual harassment "goes on everywhere, and it's a lot closer to you than you realize."  (<u>Id.</u> at 138.)  Plaintiff also testified that her coworkers made her uncomfortable and that she knew that other nurses talked about her, although she never heard her name mentioned.  (<u>See</u> <u>id.</u> at 310-311.)  Plaintiff stated that after she had submitted her resignation and voluntarily terminated her employment with defendant, one of her co-workers "verbally assaulted" her and asked if plaintiff wanted to step outside.  (<u>Id.</u> at 206-208.)  All of these comments, both singularly and collectively, fall short of the required threshold level of substantiality, and plaintiff has not demonstrated that any of these comments adversely affected the terms or conditions of her employment or deprived her of any employment

31

opportunities.  See Gupta, 212 F.3d at 587.

Having disposed of six out of seven of plaintiff's alleged retaliatory acts, the court finds that plaintiff has established a prima facie case of retaliation as to plaintiff's only remaining complaint that she was denied the Charge Nurse position in October of 1998.  The three elements of a prima facie case of retaliation have been satisfied as follows with regard to the Charge Nurse position:  (1) plaintiff's complaint to Cindy New concerning the inappropriate conduct of a sexual nature by her supervisor, Jim Alexander, was a statutorily protected activity under Title VII; (2) a Charge Nurse position became available in October of 1998 and plaintiff was adversely affected by defendant's decision not to promote her to that position; and (3) plaintiff's sexual harassment complaint to Ms. New and Ms. New's decision not to promote plaintiff to Charge Nurse are arguably causally connected because they are not "completely unrelated".  Simmons v. Camden County Bd. of Ed., 757 F.2d 1187, 1189 (11th Cir. 1985); see Gupta, 212 F.3d at 587.

Because plaintiff has established a prima facie case of retaliation with respect to the October 1998 Charge Nurse position, she has thereby raised the presumption of discrimination as to the defendant's decision not to promote plaintiff to the Charge Nurse job.  See Combs, 106 F.3d at 1527-

29.  Nonetheless, plaintiff's claim fails because the defendant has made a very strong showing of articulated legitimate and non-discriminatory reasons for the employment decision at issue, which reasons the plaintiff has failed to rebut.  See id. (explaining that once an employment discrimination plaintiff establishes a prima facie case, the burden of production then shifts to the defendant to articulate legitimate, non-discriminatory reasons for its action, following which the burden of production then shifts back to the plaintiff to offer evidence tending to show that the defendant's proffered reasons are really pretext for illegal discrimination); Chapman, 229 F.3d at 1024-25 (same as above).

Defendant has satisfied its burden by articulating the following legitimate, nondiscriminatory reasons for not selecting plaintiff for the 1998 Charge Nurse position:  patient complaints about plaintiff concerning the care received from her; plaintiff's absence from work seven times in a twelve-month period; co-worker opinions that plaintiff did not possess the necessary supervisory and leadership skills; and the concerns of Cindy New about plaintiff's leadership and managerial ability.[14]

---

[14] Plaintiff claims that Cindy New told her that seniority was also a reason why plaintiff was not selected for the Charge Nurse position.  (Dep. of Tina Shoemaker 143-145.)  Defendant maintains that seniority was not a factor that Cindy New

(See Aff. of Cindy New ¶ 7; Dep. of Tina Shoemaker 145-146.)
Defendant stated that the Charge Nurse position is a supervisory
role which requires that the Charge Nurse be "well-received among
the other nurses," (Aff. of Cindy New ¶ 5), and plaintiff agreed
that the Charge Nurse has to have a good working relationship
with other nurses on the shift, (see Dep. of Tina Shoemaker 186-
187). Plaintiff's co-workers made the following remarks about
plaintiff's disposition: she needed to improve her relationship
with her co-workers, (see Dep. of Ann Hopkins 26), she "appeared
[] to be an unhappy person . . . [and] was always complaining
about something, (Dep. of Nadine Kelly 22), and "it was miserable
. . . to have to work with her because she is a very unhappy
person," (Dep. of Susan Quinn 12).[15] At least one of
plaintiff's co-workers threatened to leave the unit if plaintiff

_____

considered when determining which candidate to select for the
position of Charge Nurse and that regardless, Ann Hopkins had an
earlier seniority date within the Oncology Department than
plaintiff. (See Dep. of Cindy New 56-57; Aff. of Cindy New ¶ 6.)
Even assuming that seniority was an articulated reason for
selecting Ann Hopkins for the position, plaintiff must rebut each
of defendant's proffered reasons in order to demonstrate pretext.
See Chapman, 29 F.3d at 1024-25. As discussed infra page 36-38,
plaintiff has failed to rebut defendant's other articulated
reasons, and thus the issue of seniority is irrelevant.

[15] Plaintiff's co-workers complained about plaintiff's
attitude before they new of plaintiff's complaints of alleged
sexual harassment or her EEOC charge. See Dep. of Ann Hopkins 14-
15, 25-26; Dep. of Nadine Kelly 8, 21-23; Dep. of Susan Quinn 11-
12, 17.)

was selected for the Charge Nurse position.  (See id.)
Furthermore, plaintiff admitted that six call-in absences from
work were acceptable and she had seven absences, (see Dep. of
Tina Shoemaker 336), causing Ms. New to be concerned about
plaintiff's attendance, (see Aff. of Cindy New ¶ 7).  These are
reasons that might motivate a reasonable employer.  See Combs,
106 F.3d at 1543.

     Furthermore, defendant stated that Ann Hopkins was the best
qualified applicant for the job. (See Aff. of Cindy New ¶ 6; Dep.
of Cindy New 52-53.)  Although defendant's belief that Ann
Hopkins was the most qualified is arguably subjective, a
subjective opinion is nonetheless legally sufficient if the
defendant articulates a clear factual basis for that opinion.
See Chapman, 229 F.3d at 1032.  Cindy New stated that she
considered attendance, dependability, teamwork, patient
complaints, patient issues, staff issues, attitude, and overall
performance when selecting a candidate for the position of Charge
Nurse.  (See Dep. of Cindy New 52-53.)  Defendant explained that
Cindy New's belief that Ann Hopkins was the best qualified was
based on Hopkins' strength in the three areas that New considered
to be the most important of those listed above: teamwork,
dependability, and attitude.  (See Aff. of Cindy New ¶ 6; Dep. of
Cindy New 52-53.)  The Eleventh Circuit recently stated that

"[p]ersonal qualities [] factor heavily into employment decisions concerning supervisory or professional positions . . . [and] often must be assessed primarily in a subjective fashion."[16] Chapman, 229 F.3d at 1033-1034 (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 991 (1988).   When "'an employer selects the person it believes is best qualified, an argument of pretext ordinarily will fail.'"   Smith v. Horner, 839 F.2d 1530, 1538 (11th Cir. 1988) (quoting Clark v. Huntsville City Bd. of Educ., 717 F.2d 525, 527 (11th Cir. 1983)).

As rebuttal evidence plaintiff has offered her prior experience as a temporary Relief Charge Nurse and as a Nurse in Oncology, a comment by Cindy New several years ago that plaintiff would make a good Charge Nurse and a comment by Cindy New that plaintiff had stronger nursing skills than Ann Hopkins, and an allegation that plaintiff was given conflicting reasons why she was not selected for the Charge Nurse position.  (See Pl.'s Mem. Opp'n Summ. J. at 7-10.)  Plaintiff attempts to challenge the defendant's articulated reasons by focusing on her experiential and educational qualifications as compared to those of Ann

---

[16] The Eleventh Circuit recently noted "[t]his Court repeatedly has stated that it will not second-guess a company's legitimate assessment of whether an employee is qualified for a particular position."  Mitchell v. USBI Co., 186 F.3d 1352, 1354 (11th Cir. 1999).

Hopkins, specifically Cindy New's testimony that plaintiff had
stronger nursing skills and that plaintiff had more experience in
Oncology. (See Dep. of Cindy New 57.)  However, Cindy New
testified that Ann Hopkins was stronger in the three areas she
considered most important:  teamwork, dependability, and
attitude, (see Aff. of Cindy New ¶ 6; Dep. of Cindy New 52-53),
and plaintiff agreed that the ability to get along with co-
workers is a legitimate requirement for Charge Nurse.  (See Dep.
of Tina Shoemaker 186-187.)  Plaintiff has not rebutted
defendant's concerns about her skills in the areas of teamwork,
dependability, and attitude:  patient complaints concerning the
care given by plaintiff, plaintiff's absence from work seven
times, and co-worker opinions that plaintiff did not possess the
necessary supervisory and leadership skills. (See Aff. of Cindy
New ¶ 7; Dep. of Tina Shoemaker 145-146.)  Plaintiff only
contends that, because she had served as the relief Charge Nurse
and had more experience in Oncology than Ann Hopkins, "[t]here is
little question that the plaintiff was qualified for the
position." (Pl.'s Mem. Opp'n Summ. J. at 7-9).  In a case such as
this, "[w]here the defendant's justification evidence completely
overwhelms any inference to be drawn from the evidence submitted
by the plaintiff, the district court may properly acknowledge
that fact and award summary judgment to the employer."  Grigsby

v. Reynolds Metals Co., 821 F.2d 590, 597 (11th Cir. 1987).

This court will not second-guess the defendant's legitimate assessment of plaintiff's qualifications for the position of Charge Nurse.  See Mitchell v. USBI Co., 186 F.3d 1352, 1354 (11th Cir. 1999).  The defendant has presented non-discriminatory qualifications for the position and legitimate reasons why the plaintiff was not chosen for the job.  Certainly the paucity of evidence from plaintiff of pretext does not satisfy the requirement of Combs and Chapman which require a production of evidence to create a factual or credibility issue as to each articulated reason for the employment decision given by a defendant.  Chapman, 229 F.3d at 1024-25; Combs, 106 F.3d at 1529.  Plaintiff is merely quarreling with defendant's reasoning and has offered insufficient evidence to show that NEARMC's employment decision was in fact motivated by a prohibited factor. See Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000). Because plaintiff has failed to rebut each of defendant's articulated, legitimate and nondiscriminatory reasons, plaintiff's Title VII retaliation claim is due to be dismissed.

In summary, the Court finds that plaintiff has failed to establish her claim of retaliation under Title VII.  Because no material issues of fact remain and because defendant Northeast Alabama Regional Medical Center is entitled to judgment as a

38

matter of law, summary judgment is appropriate.  A separate order

will be entered.

DONE this ___9__ day of January, 2001.


_____

SENIOR UNITED STATES DISTRICT JUDGE